**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 6, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KRISTIN PUNT,

        Plaintiff - Appellant,

v.

KELLY SERVICES; GE CONTROLS
SOLUTIONS,

        Defendants - Appellees.

---

THE NATIONAL EMPLOYMENT
LAWYERS ASSOCIATION AND
THE NATIONAL DISABILITY
RIGHTS NETWORK,

        Amici Curiae.

No. 16-1026

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:14-CV-02560-CMA-MJW)**

---

Ralph E. Lamar, Arvada, Colorado, for Plaintiff-Appellant.

Rick J. Patterson (Steven M.Potter, with him on the brief), of Potter, DeAgostino, O'Dea & Patterson, Auburn Hills, Michigan, for Defendant-Appellee Kelly Services, Inc.

Austin E. Smith and Steven R. Reid of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Denver, Colorado, on the brief for Defendant-Appellee GE Control Solutions.

Joan M. Bechtold of Sweeney & Bechtold, LLC, Denver, Colorado, filed an amici curiae brief for the National Employment Lawyers Association and the National Disability Rights Network.

---

Before **KELLY**, **McKAY,** and **McHUGH**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

This case involves claims brought under the Americans with Disabilities Act, 42 U.S.C. § 2000e *et seq.*, and the Genetic Information Nondiscrimination Act, 42 U.S.C. § 2000ff *et seq.*, by a temporary employee whose assignment by a staffing agency to work as the receptionist for another business was terminated after she missed a significant amount of work while being tested for breast cancer and informed the agency that, due to her cancer, she needed to take a full week plus an additional unknown amount of time off for more tests, appointments, and radiation treatments. The district court granted summary judgment in favor of the staffing agency and the business on both of these claims. The employee now appeals that ruling, as well as the denial of her motion to compel discovery from the temporary-staffing agency.

**I.**

Defendant GE Controls Solutions is a company that designs and produces hardware, software, and other materials. To meet some of its staffing needs, GE entered into an agreement with Defendant Kelly Services, a company that provides temporary-staffing services, under which Kelly provided and assigned temporary employees to GE

as needed.  Under the agreement, GE could ask Kelly to remove any of its temporary employees from their assignment at GE for any reason.  Kelly also had the right to cancel any employee's assignment on its own initiative.

Plaintiff Kristin Punt was an at-will employee of Kelly.  When she initially applied for employment with Kelly, she signed an employment application stating that the duration of any assignment she accepted depended on the needs of Kelly's customer and that it could be canceled at any time by Kelly or the customer.  The application also stated that, upon completion of each assignment, she would notify Kelly of her availability for work.  She agreed:  "I understand I am responsible for maintaining regular contact with Kelly and failure to do so will indicate I have either voluntarily quit or am not actively seeking work."  (Appellant's App. at 242.)

After GE's full-time receptionist retired, GE requested that Kelly assign a temporary employee to fill that position.  The human-resources director at GE informed Kelly that GE would consider Plaintiff for the receptionist assignment because Plaintiff had previously filled in for the receptionist on short-term assignments.

Kelly assigned Plaintiff to the receptionist position at GE, and she worked there from October 24, 2011, through December 5, 2011.  Shortly before she began this assignment, she had had a screening mammogram which showed suspicious microcalcifications in her right breast, and in November, while working at GE, she had a breast biopsy and was informed she had breast cancer.  Plaintiff alleges that she told

various GE and Kelly employees about her cancer diagnosis and her family history of breast cancer.

When she began the receptionist assignment at GE, Plaintiff was instructed that she was to work a 40-hour work week, starting at 7:30 a.m. and ending at 4:30 p.m. each day. The "essential functions" of the receptionist job included being "physically present at the lobby/reception desk during business hours" in order to "greet[] . . . and direct[] all visitors, including vendors, clients, job candidates, customers, etc." (*Id.* at 409.) However, in the six weeks that Plaintiff was assigned to work as a receptionist at GE, Plaintiff never worked a full 40-hour work week. She was absent from work on six occasions, two of which corresponded with holidays, and three of which corresponded with documented medical appointments. Plaintiff's absence on November 29 is unexplained. Plaintiff was also late to work on three occasions: by 1.5 hours on October 24, by 4.5 hours on October 27, and by 3 hours on November 30. The November 30 date allegedly corresponded with an MRI appointment, but she provided no explanation for her tardiness on the other two dates. Plaintiff left work early on three occasions as well: by 30 minutes on October 27, by 1.25 hours on November 2, and by 5 hours on November 22. On November 2, Plaintiff had a follow-up mammogram appointment, and on November 22 she left work after receiving a call with her biopsy results. Her October 27 early departure is unexplained. When Plaintiff was gone from work, Elise Greenlee, another Kelly temporary employee who was assigned to work as an administrative

assistant for the general manager of GE, had to take over Plaintiff's receptionist duties as well as her own responsibilities.

On Monday, December 5, Plaintiff had another MRI appointment, although she did not actually go through with the MRI due to claustrophobia. At 10:37 a.m. on that day, she emailed Erin Wilgus—the Kelly employee who was the point-person for Plaintiff's temporary assignment to GE—and informed her:

> After talking to my husband and doctor it is in my best interest not to come to work this week at all. I like my job at GE very much but I'm concerned that they are not going to be willing to work with me. I have barely missed work and they are already annoyed it sounds. . . . Getting surgery takes some appointment and tests and it sounds like GE [doesn't] want me to take off anytime. I guess we should both be concerned if this will be a right fit. Let me know what you think. I hope to continue on Monday.

(*Id.* at 97.) At 12:47 p.m., Ms. Wilgus emailed Plaintiff, saying that she had just left Plaintiff a voicemail and asking Plaintiff to give her a call so they could "talk through this." (*Id.* at 96.) Plaintiff sent Ms. Wilgus an email saying that she would call Ms. Wilgus after her MRI, but she apparently did not call Ms. Wilgus back. At 5:47 p.m., Ms. Wilgus sent Plaintiff an email, stating: "Please contact me ASAP. I need to let GE know whether you are going to be at work tomorrow." (*Id.* at 95.)

Plaintiff then sent Ms. Wilgus an email in which she lied about what had actually happened with the MRI and said she would need more time off for tests and for radiation treatments:

> The MRI was very scary! It lasted longer than expected. I have so much to take care of this week with tests that I don't know how I can come to work tomorrow . . . . If taking a week off is out of the question I understand.

-5-

Elise doesn't have that much work to do according to her and I'm surprised this has become such a problem. This is looking like very early stage breast cancer that will allow me to come to work and have only five times of radiation.

(*Id.*)

On or about December 5, GE's general manager and HR director contacted Ms. Wilgus to end Plaintiff's assignment, telling Ms. Wilgus that Plaintiff was not showing up for work and that GE "needed an employee that's going to be able to show up and fulfill the needs of the position." (*Id.* at 503.) Ms. Wilgus then contacted Plaintiff to inform her that her temporary assignment with GE had been terminated. According to Plaintiff, during the course of this conversation, Ms. Wilgus told Plaintiff that GE's HR director had said she wanted to terminate Plaintiff's assignment "because [she] would be very unreliable having cancer." (*Id.* at 233.)

After her assignment with GE was terminated, Plaintiff never contacted Kelly to ask for another assignment, even though she had "practically harassed them for work" in the past. (*Id.* at 223.) On February 13, 2012, Kelly offered Plaintiff a one-day assignment at a different business. She turned this assignment down because she already had work through a different temporary-staffing agency. After February 2012, Plaintiff never contacted Kelly to tell them she was available and wanted a job assignment, and Kelly did not contact Plaintiff with any additional job offers.

In 2014, Plaintiff filed this lawsuit against both GE and Kelly, raising two claims for relief: (1) a claim of disability discrimination under the ADA, and (2) a claim of

genetic information discrimination under the Genetic Information Nondiscrimination Act. During discovery, Plaintiff made a request for Kelly to "provide all documents showing all positions which Defendant Kelly filled for full-time and part-time employment in the Denver metro area including Boulder and Boulder County for positions for which plaintiff would have been qualified to fill from December 5, 2011, to the current date." (*Id.* at 125.) Kelly objected to this request on the basis that it was overly broad and unduly burdensome, it sought documents and/or materials which were neither relevant nor reasonably calculated to lead to the discovery of admissible evidence, and it sought the disclosure of confidential information of individuals who were not parties to the litigation. After unsuccessfully attempting to resolve the dispute with opposing counsel, Plaintiff filed a motion to compel. The magistrate judge denied the motion, holding that the discovery request was "clearly overly broad and unduly burdensome." (*Id.* at 110.) The district court affirmed the magistrate judge's ruling under the applicable abuse-of-discretion standard, holding that Plaintiff had not met her burden of propounding a reasonable discovery request and that the magistrate judge did not abuse his discretion in denying her motion.

On the merits of the case, the district court granted summary judgment in favor of Defendants. Although Plaintiff characterized her ADA claim as a failure-to-accommodate claim, the court held that this claim must be evaluated as a disparate-treatment claim, subject to *McDonnell Douglas* burden-shifting analysis, because Plaintiff had not presented direct evidence of a discriminatory motivation on the part of

Defendants.  The court then held that Plaintiff had failed either to establish a prima facie case of disability discrimination or to show that Defendants' legitimate, nondiscriminatory reason for her termination was pretextual.  The court further held that Plaintiff had failed to establish a prima facie case of genetic information discrimination under GINA.  The district court thus granted summary judgment in favor of Defendants on both claims for relief.

Plaintiff challenges this ruling on appeal.  She also appeals the district court's affirmance of the magistrate judge's discovery ruling.

**II.**

We review the district court's summary judgment decision de novo, applying the same standards as the district court.  *Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013).  Under these standards, "[s]ummary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  We review the denial of Plaintiff's motion to compel discovery for an abuse of discretion.  *Martinez v. Schock Transfer & Warehouse Co.*, 789 F.2d 848, 850 (10th Cir. 1986).

We consider first Plaintiff's appeal of the district court's discovery ruling. Plaintiff does not contest the magistrate judge's holding that her discovery request was overly broad.[1]  She argues, however, that the magistrate judge abused his discretion by

_____

[1] In her opening brief, Plaintiff briefly expresses some disagreement with this holding, but her legal arguments are all based on her contention that the

-8-

failing to *sua sponte* narrow her discovery request down to something more manageable and then compelling discovery for this narrowed request.  She also argues the magistrate judge unfairly forced her into a "guessing game" by requiring her to try to determine what type of discovery request the magistrate judge would deem to be appropriate, when the magistrate judge could have simply ordered appropriately limited discovery himself.  (Appellant's Opening Br. at 49.)  And, she argues that the magistrate judge's decision not to *sua sponte* fix the problems with her overly broad discovery request constituted an abusive failure to exercise discretion in a way that would follow the liberal spirit of discovery, especially since she could not file a narrower request herself because the time

magistrate judge should have narrowed her discovery request so that it would not be so broad.  Thus, any challenge to the magistrate judge's conclusion that her discovery request was overly broad has been waived by Plaintiff's failure to squarely raise it in her appellate briefs.  See *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("An appellant's opening brief must identify 'appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.'  Fed. R. App. P. 28(a)(9)(a).  Consistent with this requirement, we routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").  Plaintiff does briefly challenge the magistrate judge's conclusion that her discovery request was unduly burdensome as well.  However, she presents no persuasive reason why the magistrate judge's ruling could not be upheld based on the overly broad nature of her discovery request alone.  Moreover, we see no error in the magistrate judge's conclusion that her request was unduly burdensome.  Among other things, we note that the request would have required Kelly to individually compare thousands of potential positions with Plaintiff's list of qualifications to determine whether Plaintiff might possibly have been qualified to fill them, since she decided not to place any limitations on the type or category of job position for which she requested discovery, but rather expected Kelly to review each job position that was available in a broad geographical area over the course of several years in order to decide whether Plaintiff could possibly have filled that position.

-9-

for discovery had closed when the magistrate judge denied her motion to compel.  In response to Defendants' argument that she could have filed a motion for the district court to reopen discovery so she could file a narrower discovery request, she asserts without explanation that this would have been a futile gesture because there was only a "quixotic hope" that such a motion would have been granted.  (Appellant's Reply Br. at 31.)

"Control of discovery is entrusted to the sound discretion of the trial courts, and a denial of a motion to compel discovery will not be disturbed absent abuse of discretion." *Martinez v. Schock Transfer*, 789 F.2d at 850.  "An abuse of discretion occurs when a judicial determination is arbitrary, capricious or whimsical," and "[w]e will not overturn a discretionary judgment by the trial court where it falls within the bounds of permissible choice in the circumstances." *United States v. Shumway*, 112 F.3d 1413, 1419 (10th Cir. 1997) (internal quotation marks omitted).  The magistrate judge's decision in this case clearly fell within the bounds of permissible choice in the circumstances.  While the magistrate judge certainly had the discretion to modify the discovery request to bring it within acceptable limits, he was not required to do so.  Counsel bears the responsibility of propounding proper discovery requests, and expecting counsel to fulfill this responsibility is neither capricious nor unfair.  The magistrate judge was not required to exercise his discretion to *sua sponte* fix counsel's errors and assume counsel's responsibility of framing an appropriate discovery request.  Plaintiff's proposed holding would encourage attorneys to abdicate this responsibility in favor of phrasing their discovery requests in the broadest possible terms and placing the burden on the district court of coming up with an

-10-

appropriately limited request.  We will not adopt such a rule.  Regardless of whether or not Plaintiff could have successfully reopened discovery to make a narrower discovery request later, the magistrate judge acted well within the limits of his sound discretion when he denied Plaintiff's overly broad and unduly burdensome discovery request.  We thus affirm the court's discovery ruling.

We turn next to the merits of the case, and specifically to the district court's entry of summary judgment in favor of Defendants on Plaintiff's ADA claim.  As an initial matter, we must first determine what type of ADA claim is at issue in this case.  The district court concluded that what matters for determining the type of claim at issue in an ADA case is not the type of claim that is pled in a complaint, but rather the type of evidence that is presented to support the claim.  This conclusion was based on a fundamental misunderstanding about the distinctions between different types of ADA claims and the evidence that must be presented to support them.  A misunderstanding which we will now attempt to clarify.

In general, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Because the statute only prohibits discrimination "on the basis of disability," there must be a nexus between the disability and the adverse employment action.  In other words, it is not enough that an adverse employment action is suffered by an individual with a

-11-

disability; rather, the disabled individual must show that the adverse action was "on the basis of" the disability. In most types of ADA cases, this is done by proving the employer acted with discriminatory intent. Such discriminatory intent can be shown either through direct evidence—that is, "evidence, which if believed, proves the existence of a fact in issue without inference or presumption"—or through circumstantial evidence, which is evaluated under the *McDonnell Douglas* burden-shifting framework to determine whether a reasonable factfinder could infer that the employer's motivation was discriminatory and that any proffered nondiscriminatory business reason for the decision was merely pretextual. *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207–08 (10th Cir. 1999).

There is at least one type of ADA claim, however, which does not require any evidence of discriminatory intent, whether direct or circumstantial: a failure-to-accommodate claim. Under the ADA, "the term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). "Unlike other enumerated constructions of 'discriminate,' this construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability. Rather, any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'—the

accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability—and no proof of a particularized discriminatory animus is exigible." *Higgins v. New Balance Athletic Shoes, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999). That is to say, the only reason an accommodation is required is because of the disability, and thus the failure to provide a reasonable accommodation to a qualified employee with a disability is inherently "on the basis of [the] disability," 42 U.S.C. § 12112(a), regardless of the employer's motivation. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 n.12 (10th Cir. 1999) (en banc) ("In [a failure-to-accommodate] case, the Congress has already determined that a failure to offer a reasonable accommodation to an otherwise qualified disabled employee is unlawful discrimination," so we do not need "to probe the subjective intent of the employer."). The employer must of course know of the employee's disability and of the accommodation the employee wishes to receive in order to have any responsibility for providing such an accommodation. *See id.* at 1171–72. But, assuming the employee has provided notice to the employer of her disability, any limitations which result therefrom, and the accommodation she wishes to receive, then the employer's failure to provide a reasonable accommodation for the disability establishes the required nexus between the disability and the alleged discrimination without the need to delve into the employer's subjective motivations. Thus, the employee need present no evidence, whether direct or circumstantial, of discriminatory intent in order to succeed on a failure-to-accommodate claim.

In *Higgins*, the First Circuit held: "[A]n employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodations would create undue hardship for its business. It follows inexorably that the *McDonnell Douglas* scheme is inapposite in respect to such claims." 194 F.3d at 264 (citation omitted). While we are generally in agreement with this statement, it is important to reiterate the reason why the *McDonnell Douglas* test is inapposite in a failure-to-accommodate case: the purpose of this test is to determine whether a reasonable fact-finder could infer from the circumstantial evidence that the employer's motives were discriminatory, and in a failure-to-accommodate case there is no need for the employee to prove what the employer's motives were at all. Thus, not only is *McDonnell Douglas* inapposite, but there is also no need for the employee to present any direct evidence of discriminatory intent.

We note the Sixth Circuit has suggested that failure-to-accommodate cases should be viewed as direct-evidence cases because "the disputed issues [in such cases] will be whether such accommodation is reasonable, whether such accommodation would impose an undue hardship upon the employer, and/or whether the plaintiff is capable of performing the job even with the suggested accommodation, each of which may also be resolved through direct, objective evidence." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996). However, we are not persuaded there is any reason to constrain the types of evidence an employee may use to present a failure-to-accommodate case, subject of course to the rules of evidence. Morever, as demonstrated by the district

-14-

court's opinion in this case, such reasoning is likely to confuse the analysis of such claims. The district court held that, because *McDonnell Douglas* is inapplicable in failure-to-accommodate cases, a plaintiff must present direct evidence of discriminatory intent in order to succeed on (indeed, in order to even plead) a claim of failure to accommodate. This reasoning reflects fundamental confusion about the reason why *McDonnell Douglas* is inapplicable in a failure-to-accommodate case, and it demonstrates the hazards of referring to a failure-to-accommodate case as a "direct evidence" case, since this phrase is usually used in the discrimination context only to distinguish between the types of evidence used to establish discriminatory intent, which is unnecessary in a failure-to-accommodate case. The typical dichotomy between direct-evidence and circumstantial-evidence cases is simply inapplicable when there is no need to delve into issues of the employer's subjective motivations. Failure-to-accommodate cases should not be classified either as direct-evidence cases or as *McDonnell Douglas* circumstantial-evidence cases, but rather as a separate category of cases that require no evidence of discriminatory intent in any form.

We finally note that, contrary to the district court's holding, the question of what type of ADA claim is raised in a particular case must be determined based on the allegations in the plaintiff's complaint, not on the type of evidence (i.e., direct or circumstantial) that will be presented in support of the claim.

We turn then to the question of what type of ADA claim Plaintiff raised in this case. Plaintiff asserted below and maintains on appeal that her complaint pled a failure-

to-accommodate claim, while Defendants argue that her complaint should instead be construed to plead a disparate-treatment claim. Plaintiff's complaint is far from a model of clarity on this point. However, contrary to Defendants' suggestions, the ADA claim in her complaint looks much more like a failure-to-accommodate claim than a disparate-treatment claim. Moreover, the record reveals that Plaintiff and counsel for both GE and Kelly focused extensively in the discovery proceedings on questions of whether Plaintiff's request for time off was a request for a reasonable accommodation, and no one ever attempted to elicit any evidence to support or defeat a disparate-treatment theory. Given this fact, we are unpersuaded by Defendant GE's argument that it thought Plaintiff had raised a disparate-treatment theory and would be unfairly prejudiced by her "belated" characterization of her claim as a failure-to-accommodate claim instead. Under all of the circumstances of this case, we are persuaded that Defendants were sufficiently put on notice that Plaintiff had raised a failure-to-accommodate claim in her complaint, and we will accordingly treat it as such on appeal.

We turn then to the merits of Plaintiff's failure-to-accommodate claim, considering de novo whether Defendants were entitled to summary judgment on this claim. While the usual *McDonnell Douglas* framework is inapplicable in a failure-to-accommodate case, this circuit has adopted a modified burden-shifting framework to assess such claims—not to decide what inferences the jury can draw about the employer's intent, as in the typical *McDonnell Douglas* case, but rather "simply to provide a useful structure by which the district court, when considering a motion for summary judgment, can determine whether

the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered." *Smith*, 180 F.3d at 1178 n.12. Under this modified framework, the employee must make an initial showing that "(1) she is disabled; (2) she is 'otherwise qualified'; and (3) she requested a plausibly reasonable accommodation." *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012). "Once the employee produces evidence sufficient to make a facial showing on . . . her prima facie case, the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Smith*, 180 F.3d at 1179. "If the employer does either of the above, summary judgment will be appropriate for the employer unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of . . . her prima face case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements." *Id.*

We start and end our analysis with the third element of Plaintiff's prima facie case—whether "she requested a plausibly reasonable accommodation." *Sanchez*, 695 F.3d at 1177. Plaintiff asserts she requested a plausibly reasonable accommodation when she informed her supervisor at Kelly on a Monday morning that she planned "not to come to work this week at all" and indicated she would need additional time off for "some appointments and tests" and for "five times of radiation." (Appellant's App. at 96–97.)

-17-

We conclude as a matter of law, however, that this request was not plausibly reasonable on its face.

The determination of whether a requested accommodation is reasonable "must be made on the facts of each case taking into consideration the particular individual's disability and employment position." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1123–24 (10th Cir. 2004). "Whether an accommodation is reasonable under the ADA is a mixed question of law and fact," but "an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Id.* at 1122. "[P]hysical attendance in the workplace is itself an essential function of most jobs," *id.* at 1119, and an employee's request to work from home "is, as a matter of law, unreasonable" if the employer has decided that physical presence at the workplace is an essential function of the position, *id.* at 1124. On the other hand, "[i]t is well-settled that a request for leave may lead to a 'reasonable' accommodation—such a request may allow an employee sufficient time to recover from an injury or illness such that the employee can perform the essential functions of the job (i.e., attend work) in the future." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000). "However, the term 'reasonable accommodation' refers to those accommodations which presently, or in the *near future*, enable the employee to perform the essential functions of his job," and thus an employee is required to inform the employer of the "*expected duration of the impairment* (not the duration of the leave request)." *Id.* at 1129–30 (internal quotation marks and brackets omitted). "Without an expected duration

of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job *in the near future* and therefore whether the leave request is a 'reasonable' accommodation." *Id.* at 1130.

In this case, Plaintiff did not inform either Kelly or GE of the expected duration of her impairment, and "she was very vague about how much time she . . . was going to miss" as well. (Appellant's App. at 266.) Moreover, we note that Plaintiff has not cited to a single case in which a court found a leave of absence to be a reasonable accommodation for a temporary employee who was assigned to fill a position at a business by a temporary-staffing agency. The accommodation Plaintiff requested would have required GE either to go without someone working at the receptionist position it had contracted with Kelly to staff (requiring others at GE to take over Plaintiff's duties at the receptionist desk while still carrying out their own job duties), or to accept a super-temporary employee or employees who would fill in for Plaintiff for the week she wanted off and for whichever other additional times she needed to take off for tests, appointments, "times of radiation," and other cancer-related reasons, while letting Plaintiff return to take over her temporary job position whenever she was free and felt up to attending work. Particularly for temporary employees, the ability to "report to work consistently[ is] a necessary part" of the job, *Jackson v. Veterans Admin.*, 22 F.3d 277, 280 (11th Cir. 1994), and neither Plaintiff's past behavior nor her vague request for more time off suggested she would be able to fill this necessary part of her job in the near future. *See id.* Under all of the circumstances of this case, and especially in light of

Plaintiff's position as a temporary employee whose physical presence at the workplace was the most essential function of her job, we are persuaded the accommodation Plaintiff requested from GE was unreasonable as a matter of law.

We also see no merit to Plaintiff's conclusory assertion that Kelly failed to accommodate her disability by failing to contact her about additional job positions after her assignment with GE was terminated. The undisputed evidence establishes that Plaintiff was required to contact Kelly when she wanted to receive another assignment and that, contrary to her past behavior in "practically harassing" Kelly for a new assignment when she wanted work (Appellant's App. at 223), she never contacted Kelly again after her assignment with GE had ended. Moreover, we note that Plaintiff has not adequately briefed this argument or provided any cases in support, and thus any additional argument on this point has been waived.

We accordingly affirm the district court's entry of summary judgment in favor of Defendants on Plaintiff's ADA claim.

We turn then to the final issue before us in this case: whether the district court erred in granting summary judgment in favor of Defendants on Plaintiff's GINA claim. GINA provides that "[i]t shall be an unlawful practice for an employer . . . to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of the employee, because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(a). Plaintiff argues there are two facts from which a jury could find that Kelly

-20-

and/or GE discriminated against her based on her genetic information: first, Plaintiff told various individuals at Kelly and at GE about her family history of breast cancer; and second, Plaintiff was fired after she requested time off for her breast-cancer treatment. She argues that "a jury *could* find that [P]laintiff's employment was terminated based upon Defendant[s'] assumptions about the needed course of treatment based upon her genetic information of multiple women in her family having been diagnosed with breast cancer," (Appellant's Opening Br. at 56), because the jury could infer that Defendants had a "biased opinion that [P]laintiff's family history of breast cancer would have an effect upon her own cancer treatment and/or recovery," (*id.* at 57). However, such a finding would require rank speculation, without any supporting evidence, regarding Defendants' assumptions about the role of a family history of breast cancer on a breast-cancer patient's treatment and recovery. We are persuaded that the evidence cited by Plaintiff would not permit a jury to reasonably infer that Defendants' knowledge of Plaintiff's family history of breast cancer contributed to the decision to terminate her temporary assignment at GE. Moreover, even if Plaintiff had presented such evidence, she has not even attempted to present any evidence or argument to suggest that Defendants' legitimate nondiscriminatory reason for her termination was a pretext for discrimination on the basis of genetic information. We accordingly affirm the district court's entry of summary judgment in favor of Defendants on Plaintiff's GINA claim.

**III.**

For the foregoing reasons, we **AFFIRM** the district court's discovery ruling and the entry of summary judgment in favor of Defendants on both of the claims in Plaintiff's complaint.